1

2

3

4

5

6

7                        IN THE UNITED STATES DISTRICT COURT

8                       FOR THE EASTERN DISTRICT OF CALIFORNIA

9    REBECCA WILSON,

10              Plaintiff,                        No. CIV S-06-1607 GGH

11         vs.

12   MICHAEL J. ASTRUE,[1]
     Commissioner of Social
13   Security,
                                                  ORDER
14
                Defendant.
15   _____/

16              Plaintiff seeks judicial review of a final decision of the Commissioner of Social

17   Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits

18   ("DIB") under Title II of the Social Security Act ("Act").  For the reasons that follow, plaintiff's

19   Motion for Summary Judgment is DENIED, the Commissioner's Motion for Summary Judgment

20   is GRANTED, and the Clerk is directed to enter judgment for the Commissioner.

21   BACKGROUND

22              Plaintiff, born December 17, 1949, applied for disability benefits on March 24,

23   2004. (Tr. at 42.)  Plaintiff alleged she was unable to work since September 21, 1999, due to

24
     _____
25        [1]  Michael J. Astrue became Commissioner on February 12, 2007.  Accordingly, he
     should be substituted as defendant in this suit.  Fed. R. Civ. P. 25(d)(1).  No further action need
26   be taken by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §
     405(g).

                                                  1

back and neck pain, and high blood pressure.  (Tr. at 42, 48, 66.)

In a decision dated November 15, 2005, ALJ Plauche F. Villere Jr. determined that plaintiff was not disabled.[2]  The ALJ made the following findings:

> 1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2004.
>
> 2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3.  The claimant has the following medically determinable impairment(s): back and neck strain and hypertension.
>
> 4.  The claimant does not have any impairment or impairments that significantly limit her ability to perform basic work-related activities; therefore, the claimant does not have a "severe" impairment (20 CFR § 404.1520).

---

[2]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

1
     5.     The claimant was not under a "disability" as defined in the
2
Social Security Act, at any time through the date of this
decision (20 CFR § 404.1520(c)).

3
(Tr. at 17.)

4
ISSUES PRESENTED

5
     Plaintiff has raised the following issues:  A. Whether the ALJ Failed to Properly

6
Assess All of Plaintiff's Impairments Standing Alone or in Combination in Determining Whether

7
She Had a Severe Impairment; and B.  Whether the ALJ Failed to Credit Plaintiff's Statements as

8
to the Nature and Extent of Her Pain and Functional Limitations.

9
LEGAL STANDARDS

10
     The court reviews the Commissioner's decision to determine whether (1) it is

11
based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

12
the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

13
Substantial evidence is more than a mere scintilla, but less than a preponderance.  Saelee v.

14
Chater, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might

15
accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct.

16
1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206

17
(1938).  "The ALJ is responsible for determining credibility, resolving conflicts in medical

18
testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir.

19
2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

20
interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

21
Thomas v. Barnhart, 278  F.3d 947, 954 (9th Cir. 2002).

22
ANALYSIS

23
  A.  Severe Impairments

24
     Plaintiff first contends that in considering plaintiff's impairments at step two, the

25
ALJ did not find plaintiff's aortic insufficiency, high blood pressure, early degenerative disc

26
disease of the thoracic spine, osteoporosis of the lumbar spine and femoral neck, and back and

3

1   neck strain to be severe impairments.

2          At the second step of the disability analysis, an impairment is not severe only if it

3   "would have no more than a minimal effect on an individual's ability to work, even if the

4   individual's age, education, or work experience were specifically considered." SSR 85-28.  The

5   purpose of step two is to identify claimants whose medical impairment is so slight that it is

6   unlikely they would be disabled even if age, education, and experience were taken into account.

7   Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987).  "The step-two inquiry is a de minimis

8   screening device to dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th

9   Cir. 1996).  At this step, the ALJ may decline to find a severe impairment "*only* if the evidence

10  establishes a slight abnormality that has no more than a minimal effect on an individual's ability

11  to work."  Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005) (emphasis in original).  Of

12  importance to the outcome here, mere allegations of severe symptoms cannot qualify as a severe

13  impairment.  There must be objective evidence in the first place of an impairment that might

14  affect a person's ability to work for twelve months or longer.  Ukolov v. Barnhart, 420 F3d 1002,

15  1004-05 (9th Cir. 2005).

16         The ALJ found that plaintiff had no severe impairments, only that her back and

17  neck strain and hypertension were "medically determinable impairments."  (Tr. at 17.)

18         Plaintiff was diagnosed with mild hypertension; however, as explained by the ALJ

19  it was under good control through medication.  (Tr. at 16.)  The records referenced by plaintiff do

20  indicate elevated blood pressure, but it was normalized by medication.  (Tr. at 201, 237, 239,

21  187, 176.)  There is no indication that this condition affected at all plaintiff's ability to perform

22  work activities.

23         Stable, moderate aortic insufficiency was also diagnosed but, as the ALJ noted,

24  various cardiac tests were normal.  (Tr. at 16, 210, 185, 199.)  In fact, treating cardiologist Dr.

25  Mendelsohn noted this diagnosis, and chose to see her in one year, indicating that this condition

26  did not require much attention.  (Id. at 199.)  Dr. Mendelsohn did eventually prescribe

1    medication for this condition three years later, but the records on this condition are sparse.  (<u>Id.</u> at

2    187.)  On January 19, 2004, plaintiff was admitted to the hospital for left sided facial and arm

3    tingling.  Plaintiff was treated only with oxygen and rest.  (<u>Id.</u> at 135.)  Cardiac treadmill test and

4    echocardiogram were recommended, and were completed on February 9, 2004, with normal

5    results.  (<u>Id.</u> at 176.)  Plaintiff alleged a near syncopal episode in March, 2004.  (<u>Id.</u> at 229.)  A

6    carotid ultrasound was ordered, and results indicated no significant stenosis or flow reduction on

7    either side.  (<u>Id.</u> at 168.)  There was no other treatment in the records for this ailment.

8           Plaintiff was diagnosed with osteoporosis as alleged, but records indicate that a

9    second Dexa scan revealed substantial improvement from the scan taken two years earlier.  (Tr.

10   at 221.)  Plaintiff was advised to continue her calcium and decrease Fosamax.  (<u>Id.</u>)  There were

11   no other records indicating limitations as a result of this condition.

12          Plaintiff was additionally diagnosed with early degenerative disc disease in the

13   thoracic area on February 2, 2004, as noted by the ALJ.  (Tr. at 180.)  This condition is only

14   significant if it results in symptoms.  <u>See</u> <u>Ukolov v. Barnhart</u>, <u>supra</u> (finding that plaintiff can

15   only establish impairment if record includes signs – the results of "medically acceptable clinical

16   diagnostic techniques," such as tests – as well as symptoms, i.e., plaintiff's representations

17   regarding his impairment).  The mere diagnosis of degenerative disc disease is quite common in

18   people of plaintiff's age group.  As explained in <u>www.spine-health.com</u>:

19           A large part of many patients' confusion is that the term
             'degenerative disc disease' sounds like a progressive, very
20           threatening condition.  However, this condition is not strictly
             degenerative and is not really a disease:
21           Part of the confusion probably comes from the term 'degenerative,'
             which implies to most people that the symptoms will get worse
22           with age.  The term applies to the disc degenerating, but does not
             apply to the symptoms.  While it is true that the disc degeneration
23           is likely to progress over time, the low back pain from degenerative
             disc disease usually does not get worse and in fact *usually* gets
24           better over time.
             Another source of confusion is probably created by the term
25           'disease,' which is actually a misnomer.  Degenerative disc disease
             is not really a disease at all, but rather a degenerative condition that
26           at times can produce pain from a damaged disc.

> Disc degeneration is a natural part of aging and over time all
> people will exhibit changes in their discs consistent with a greater
> or lesser degree of degeneration.  However, not all people will
> develop symptoms.  In fact, degenerative disc disease is quite
> variable in its nature and severity.

Furthermore, physicians disagree on what constitutes a diagnosis of degenerative disc disease.

Id. (emphasis in original).

This condition by itself is not significant unless it results in impairment.  Since there is only one record indicating this diagnosis, it is not a severe impairment.  It is only relevant to the extent that plaintiff was experiencing symptoms in her neck.  In that regard, electromyography of the neck was normal on January 28, 2000.  (Tr. at 98.)  Plaintiff received chiropractic care for her neck and back in 2001 due to a car accident on October 23, 2001.  (Id. at 156, 159.)  On October 24, 2001, chiropractor Robert James diagnosed plaintiff with cervical, thoracic, and lumbosacral sprain or strain.  At this time, she had reduced range of motion.  (Tr. at 161.)  He recommended spinal adjustment, electrical stimulation, moist heat and traction for six weeks.  He stated there were no work limitations but advised caution.  (Id. at 162.)  The records indicate sporadic exacerbations of plaintiff's neck and back pain about once or twice a year after this initial treatment.  On January 25, 2002, plaintiff had paraspinal spasm in the neck and lower back.  She was diagnosed with cervicothoracolumbar strain with multiple trigger point tender areas.  (Tr. at 105.)  On February 20, 2002, plaintiff continued to suffer neck and back pain.  An MRI of the cervical and lumbar spine was ordered.  Plaintiff was to continue naproxen and Vicodin and receive chiropractic care.  (Tr. at 243.)  Plaintiff's MRI of February 22, 2002 indicated "very minor degenerative changes at L5-S1, mild dessication, and very mild disc bulging."  There was no disc protrusion or impingement.  (Id. at 196.)  On January 30, 2003, plaintiff hurt her neck and back from picking up a large bag of dog food.  She was diagnosed with cervical somatic dysfunction, and given Toradol.  She was prescribed Vioxx, Soma and Vicodin.  (Id. at 236.)  On May 18, 2004, she was injected with Toradol and prescribed Vioxx and Soma.  Chiropractic treatment and anti-inflammatories were recommended but plaintiff

refused them, saying they didn't help.  (Id. at 217.)

Plaintiff received additional treatment for chronic low back pain on November 6, 2001 and November 23, 2003.  She was given Toradol, and prescribed Bextra, Skelaxin, naproxen, and Flexeril.  (Tr. at 112, 110.)  This summary is the sum total of treatment for plaintiff's neck and back problems over a five year period.[3]

On August 18, 2004, an SSA consultation found plaintiff to have no severe impairments.  (Tr. at 244.)  Although plaintiff did receive some treatment for her neck and back, her problems are so mild that the court finds they have no more than a minimal effect on her ability to work.  Webb, 433 F.3d at 686-87.  Therefore, the ALJ did not err in declining to find them to be severe.  This is true individually or in combination.

B.  Whether the ALJ Failed to Credit Plaintiff's Statements as to the Nature and Extent of Her Pain and Functional Limitations

Plaintiff next asserts that there is nothing in the record to support the ALJ's credibility finding.  The contention here begs the issue.  As related in the previous section, because plaintiff has not objectively demonstrated severe impairments, her alleged symptoms, even if believed, could not qualify her alleged maladies as a severe impairment(s).  Nevertheless, the court will analyze the contention under traditional standards as well.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons.  See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

---

[3]  The records contain sporadic treatments prior to January, 2000; however, plaintiff does not refer to them as significant, and the main aggravating factor appears to be her auto accident in October, 2001.

1    In evaluating whether subjective complaints are credible, the ALJ should first

2 consider objective medical evidence and then consider other factors. Bunnell v. Sullivan, 947

3 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible

4 solely because objective medical evidence does not quantify them. Id. at 345-46. If the record

5 contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ

6 then considers the nature of the alleged symptoms, including aggravating factors, medication,

7 treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the

8 applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or

9 inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

10 and (3) daily activities.[4] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally

11 SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician

12 and third party testimony about nature, severity, and effect of symptoms, and inconsistencies

13 between testimony and conduct, may also be relevant. Light v. Social Security Administration,

14 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations,

15 see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for

16 medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Absent

17 affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony

18 must be clear and convincing. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595,

19 599 (9th Cir. 1999).

20    Here, the ALJ reviewed all the reasons he thought plaintiff's complaints of pain

21 were not credible. First, he referred to plaintiff's activities which include grooming, household

22 chores, shopping and driving from Shasta Lake to Sacramento. (Tr. at 17.) Plaintiff's daily

23
_____

24    [4] Daily activities which consume a substantial part of an applicants day are relevant.
"This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
25 activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
any way detract from her credibility as to her overall disability. One does not need to be utterly
26 incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
(quotation and citation omitted).

1   activities questionnaire additionally states that on an average day plaintiff walks, rides a bike,

2   exercises, helps with almost teen children, and helps at the Red Cross.  (Tr. at 85.)  Plaintiff

3   states she does not take medication to help her sleep, although she gets up during the night.  She

4   has no difficulties taking care of her personal needs.  (Id.)  She cooks her own meals, shops once

5   a week, does all her household chores, and her activities include walking, biking, crocheting,

6   family camping, and swimming.  (Id. at 86.)  She leaves the house at least once a day, either

7   walking, biking or driving a car.  She needs no assistance in getting out.  She visits with family

8   almost every day, and either swims with them, goes to the park, plays miniature golf, or

9   otherwise just spends time with them.  (Id. at 87.)  She also states that when she is in pain, it is

10  hard to concentrate; however, she also states that she was taking no medication at this time, other

11  than ibuprofen.  (Id. at 88, 89.)

12          Although plaintiff reported that she stopped working due to neck and back pain,

13  the ALJ noted the lack of medical findings and that her impairments were not severe.

14  Additionally, the ALJ stated that plaintiff's hypertension was controlled by medication.  (Tr. at

15  17.)

16          These reasons are sufficient, especially in light of the dearth of medical evidence

17  in the record.  As discussed in the previous section, the SSA reviewer found that plaintiff did not

18  have a severe impairment.  (Tr. at 244.)  No other physician in the record limited plaintiff's

19  functional capacity in any way.  Plaintiff's disability report states in response to the question

20  "[h]ow do your illnesses, injuries or conditions affect your ability to care for your personal

21  needs?," "most days it isn't a problem."  (Tr. at 59.)  Although plaintiff testified that she had to

22  stop the car at every rest stop on the way to Sacramento, and that she had some good days and

23  some bad days, the ALJ was free to consider that her testimony was not consistent with the

24  medical record, which indicated only sparse treatment for her back and neck, lack of surgery or

25  other significant treatment, and other conditions that were either controlled by medication or

26  stable and causing no problems.  Credibility findings are the province of the ALJ.  Fair v. Bowen,

1  885 F.2d 597, 604 (9th Cir. 1989).

2        The court finds that the ALJ's credibility analysis was legally sufficient and

3  supported by the record.

4  <u>CONCLUSION</u>

5        In sum, the court finds the ALJ's assessment is fully supported by substantial

6  evidence in the record and based on the proper legal standards.  Accordingly, plaintiff's Motion

7  for Summary Judgment is DENIED, the Commissioner's Cross Motion for Summary Judgment

8  is GRANTED, and the Clerk is directed to enter Judgment for the Commissioner.

9  DATED: 9/12/07

                                    /s/ Gregory G. Hollows

10                                  _____
                                    GREGORY G. HOLLOWS
11                                  U.S. MAGISTRATE JUDGE

GGH/076
12  Wilson1607.ss.wpd

13

14

15

16

17

18

19

20

21

22

23

24

25

26